The Honorable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is United States v. Juan E. Seary-Colon, appeal number 18-1859. Attorney Rivera, please reintroduce yourself on the record and proceed with your argument. Good morning. Counsel Johnny Rivera-Gonzalez. On behalf of Appellant, Mr. Juan E. Seary-Colon, known as Mr. Ricky Diablo, I respectfully request your Honor to reserve two minutes for rebuttal. Yes. May it please the Court. I've been working really hard on this case and trying to come up with a phrase that covers very well this case. So I'm going to state the phrase and then explain myself why I come with this phrase. The devil is guilty of sin ever since we placed him in our religious folklore. That proposition is a really tough proposition, but it will make sense in this case because the Appellant is arguing on his brief that two premises, two grounds were infringing this case. The first one has to do with the right to counsel and the second one has to do with due process. When we bring the issue of due process, we bring the issue of identification. In this case, the Appellant duly reserved through filing a motion to suppress the identifications in this case because they were unduly suggestive. And the record totally supports Appellant's positions in the sense that in this case, primarily, the agents had a nine-photo array of the defendant without any physical or scientific connection or link to the offense of Appellant. And the record is silent as to why the Appellant was placed in that nine-photo lineup. Why is the record silent on that point? Why didn't someone explore that during the motion to suppress? I wasn't the attorney below and I read the transcripts and I don't see why. I know maybe the issue had been cross-examined at that point, but I couldn't find it in the transcript, Your Honor. However, Your Honor, if we go a little bit further on that, by the time the defendant was later arrested and his arrest appeared in the newspaper in Puerto Rico. And the initial phrase that I bring to this court attention comes in the sense that not only was the photograph of the defendant placed in a major newspaper in the island, but his nickname in Puerto Rico is Diablo, which in English is the devil. However, based on our social and cultural connotations are different. And the word Diablo is a very tough label to be put to a defendant here in the island. Not only did that happen, but after the defendant was arrested and he was appointed counsel here at the federal court, still the government insisted in conducting a second six-photo lineup after the defendant had already been arrested. Is there anything in the record as to why it went from nine to six? No, no, Your Honor. We don't have anything. We don't have any protocol. The only protocol that we have, and it appears in the government's own brief, is that once the defendant is arrested, it should have been a physical lineup in this case. And it should have been a physical lineup to prevent exactly the reason why we are here today. For two reasons. First, his attorney should have been notified because it's a critical stage. He has to be identified of a very horrendous crime, and the community and our society wants to punish the person who committed this horrible offense. However, Your Honor, we don't have any physical evidence or scientific evidence to link the defendant to this offense, bringing him to a second lineup after all the publicity that came forward in the newspaper with his name and his photograph. And not only that, this first witness admitted... So the first photo array was done before his picture was in the paper, and there were nine. And was there anything that you're arguing that was inherently deceptive about the photo array? Your Honor, the only thing I can bring is the fact that we don't know why this appellant was placed in that photo array besides gut feelings. And gut feelings are not evidence, Your Honor. But he was, and he was selected. He was, and he was selected. And there's nothing to suggest that it was an unduly suggestive photo array, is it? Well, I cannot say that, but it's suspicious, Your Honor, because why would you place the defendant in this nine-picture lineup if you don't have any concrete evidence to tie him to the offense? Why? I don't know, but the record is solid. I know, but you cannot take that point alone. You have to combine that point with the other facts that are happening in this case through the course of the investigation. In this case, you don't only have that, but you have the newspaper article, okay? And we are aware that the first witness who participated in the nine-photo session array admitted that he saw the newspaper article through the agent. And when he went to court and testified in court, he didn't do an in-court identification. Instead, the police officer made an identification on his behalf, saying that he identified the appellant through the nine-photo array. It would be helpful to me. What are you trying to suppress? The in-court identification, the nine-person identification, the six-person identification. What is it that you want? I want to suppress the entire identification process in this case. Including the in-court? That is correct, Your Honor, because it's part of the proof. Starting with the first, what's wrong with the nine-person identification? Why is that excluded? Well, the nine-photo identification in this case, Your Honor, by itself, looking at it by itself, they might not be suspicious. Okay, so then what's wrong? And the six-person, you want to exclude it because it was after the photo? It was after the photo. It was after the arrest, and the defendant was entitled to have his attorney notify that there was going to be a lineup. He was denied the right to counsel in a critical stage of the proceedings, Your Honor. And not only do—and this attorney, he had been notified that— That is the second part of our argument. That is correct, Your Honor. Well, putting that aside, is there anything wrong in terms of this, other than the attorney not being present, is there anything wrong with the six-person ID other than the fact that it occurred after the photo was in the paper? Your Honor, we're going again. There's one nine-photo lineup, and then we have a six-photo lineup. We are not following any protocol, and the case law is very straight, that once the defendant was physically present, just as the on-government states, he should have been a personal lineup. So it's very suspicious again, and it's undoubtedly suggestive in this case, after the photograph appeared in the newspaper, Your Honor. And not only was, again, the photograph appeared in the newspaper, but we have to remember also, Your Honor, that there was a circus in this case. Why do I mean a circus? They found a single-bullet cartridge in this case of a Federal .40-caliber cartridge. And we all know that it's a very, very popular cartridge in the U.S. And on top of that, not only was the important photograph in the newspaper, it refreshed the recollection of the on-government witness in the sense that he was able to say, no, he wasn't wearing a jacket as such. He was wearing a hoodie. So that's why it is so material. Let me just ask you one last question. Yes, sir. If nine-person identification were allowed in, what would be the prejudice with respect to allowing the six-person identification or the in-court identification in, given that the nine-person identification would be admissible? Well, it would be a different story, and it would be a different case because we only would have this particular identification, and then it would depend on what other parts in the case are allowed to come in. If you're only going to allow the nine-person identification, then we have to be careful because the only one, this witness did not directly identify in court the appellant. It was the police officer who came forward and said, I met with this witness, and the witness identified the appellant in this nine-person lineup. So it would be a completely different case. It would be a completely different strategy for the defense counsel to follow and a completely different set of cross-examination questions. So in this regard, it would probably shift the case in the favor of the defense if you only had that nine-person lineup. Mr. Rivera, let me ask the panel if there are additional questions. No. All right, you've reserved some time. We'll hear from Mr. Trumbull. Thank you, sir. Mr. Rivera, that would be good. Thank you, Judge. You're welcome. Attorney Trumbull, if you would unmute your audio and video at this time and introduce yourself on the record. Good morning once again to the court. May it please the court, SAUSA Seth Trumbull on behalf of the government. As your honors have correctly indicated, the central question in this case is whether the trial court correctly allowed in the three out-of-court identifications and one in-court identification in this case. If the trial court was correct, the appellant's sufficiency argument has to fail. The only aspect of that claim that he's preserved for appeal is whether the government proved beyond a reasonable doubt that he was, in fact, the person who committed the acts in the counts of conviction. Do you know how the defendant got in the first? Again, your honor, the record's silent on the point, and anything else would just be speculation. It's just so odd that there was, at least based upon the record that I've seen, it's just odd that there was nothing at that point tying the defendant to the crime. I believe there was some investigative information, but, again, the record's silent on the point, and I don't want to introduce information that's not in evidence to the court's opinion here. Why was there the protocol deviation from nine to six? Your honor, to the best we can tell from the record, again, the six-person array was standard FBI. The nine-person array was a local police identification, and the six-person array was an FBI identification conducted by FBI task force officers here in Puerto Rico. So, as your honor's correctly focusing in on, the two photo arrays really are the bedrock of the government's case in this trial, and there's really no basis to attack the suggestiveness, and, again, the appellant hasn't stated with any particularity a reason that would support a finding of undue suggestiveness as to either one. Could you remind me, was the nine-person identification less solid than the six-person identification, or are they equally clear selections? They're equally clear selections, your honor. I mean, from the record, there's no indication that there was equivocation on either one. They're actually the same photos in the six-person and the nine-person array. The six-person array obviously just has to be less. What do you say about at the six-person stage this idea that the attorney should have been present for it and that it should have been a lineup rather than a photo array? Well, your honor, I guess I would just state, again, there's nothing in the case law to indicate that the government's required to use a specific procedure. Perhaps, you know, the appellant might have preferred it otherwise, but the government was well within its rights to do a photo array at this stage of the proceedings. And what about the attorney being present? Well, on the record we had, the task force officer, Martinez-Martinez, said explicitly that the fact that the attorney would have been present wasn't the reason that the photo array was conducted in this case. He didn't say why the photo array was conducted, but he said specifically that the fact that appellant would have been entitled to counsel was not the reason that an in-person array wasn't conducted. I realize the government isn't required to do forensic testing, but why in a case of this seriousness wasn't some forensic testing done, fingerprint evidence, or something? Again, your honor, the record's pretty silent on this point. We have the fact that there was no, one of the witnesses for the government testified that there was no blood spatter at the scene, and so there wouldn't have been, I think the reasonable conclusion there is that there wouldn't have been blood spatter evidence to analyze. As to the fingerprint, we don't have a good reason in the record, but we do know, of course, from the case law, the government's not required to disprove every hypothesis inconsistent with guilt, that really the government's requirement is to prove the elements of the offense is beyond a reasonable doubt, and there really can be no claim that the government failed in that regard here. I would just offer that two weeks after the event in this case, the government had three out-of-court identifications of the same person, and further investigation, whether it would have been possible or not, the three out-of-court identifications certainly are enough on this court's prior holdings. For example, Foxworth v. St. Amand, a 2009 opinion where the court said that a single eyewitness can suffice to ground a conviction, so we know that there was sufficient evidence in this case to tie a point to these crimes. Could you just address the issue? Other than the nine-person identification, all the other ones are made after the picture appears in the newspaper. Is that right? Yes, Your Honor. So there's the nine-person array on April 4th. There's the identification from the newspaper itself on April 11th by the same witness who did the April 4th identification, and then there's the nine-person array on, I believe, it's April 17th by another eyewitness. You mean the six-person array? Excuse me. So could you just go back one step? The person who makes the identification in the six-person array, had that person seen the picture? She stated at trial that she did not learn about the arrest from the newspaper. The record's silent as to whether she had specifically seen the newspaper. But, of course, we know from Perry v. New Hampshire that if she came into contact with the newspaper independently, that really shouldn't factor in any suggestiveness analysis, wouldn't raise a suggestiveness concern. And at the end of the Perry opinion, the court actually specifically refers to a situation where a witness receives a suspect in the press and makes an identification on that basis as being outside the ambit of suggestiveness analysis going forward. Just going back, though, to showing the picture, when you say that there's this nine-person identification and the six-person identification, you say there's one more. What's that other one? That other one is the identification by the witness who did the nine-person array of the appellant in the newspaper. So on April 11th, the investigating officer, the lead investigator on the case, sees appellant's photograph on the front page of the newspaper and calls the witness who had done the prior identification and says, Hey, take a look at the newspaper and let me know if you see anything. And the witness looks at the newspaper and calls him back a few hours later and says, That's him. And then they write a statement. And that's different than, that's not the same witness who does the six-person identification? No, that's a different witness than the six-person identification. So we have two separate witnesses doing the two different arrays, and the same witness does the nine-person array and the newspaper identification, and then the other witness does the six-person array and the in-court identification. It strikes me as very odd that the police officer would call up a witness and tell them to look at the newspaper. I mean, that seems to be suggestive. So, Your Honor, I think there's a couple of questions that you raised there. One, whether that would be the type of government action that would, you know, implicate due process concerns post-Perry. And, again, as I said at the end of the Perry opinion, there's some language to the effect that a situation where a witness perceives the suspect in the press and makes an identification on that basis wouldn't be subject to suggestiveness analysis. This is obviously not exactly that case. But the words that the officer uses here are, just take a look at the newspaper and let me know if you see anything. He doesn't call him down to the station house and put the newspaper in front of him. He doesn't call and say, hey, take a look at the front page and tell me if that's our guy. He uses pretty careful language. In court, how did that identification get presented to the jury? It was presented via both the eyewitness himself and via the officer who had made the call. And was the jury informed that the call had been made to the person who made that identification? Yes, it all came out on the record. And this is the same witness who mistakenly identified his clothing? That's exactly right, Your Honor. But that came out in cross? That came out in cross-examination and in closing. And was raised several times by counsel below as reason to undercut. And I would note that it's a dark hoodie in the newspaper photo. And in the video and the still from the video of the actual event, it's a dark jacket with a hat. Not that much of a difference, frankly, from a dark hoodie. And certainly just really fodder for the jury's consideration. And just last two questions. We have nothing about the one way or the other as to whether the person that made the six person identification had seen the picture in the paper. That's right. Was that asked to cross or not? I believe it was asked to cross. I would have to double check, Your Honor. And I could file a 20HA if Your Honor would like. And then with respect to the last identification that occurred in court, that's by the officer? That was by the witness who did the six person photo. So she did an in-court identification. The two officers who had conducted the photo arrays also did in-court identifications. She does the in-court identification after she has seen the. After she's identified the person in the six person array. That's exactly right. Do we know anything that was communicated to her after she did that six person array identification? We don't. There was certainly speculation by defense counsel that the two witnesses prior to the six person array had discussed it. But she stated on the stand that she didn't. Both witnesses actually stated that they hadn't. And there was nothing to indicate one way or the other what had been discussed with her after that six person array. And was there a direct objection to the in-person identification, in-court identification by her? There was not, Your Honor. Mr. Trimble, I have one or two follow-up questions with respect to the nine person array. As you have said, the record does not disclose or explain why the appellant was included in that array. But you've suggested that there was perhaps a reason for it. And are you aware of that reason? I've had discussions outside the context of the record, yes, Your Honor. Can you represent to us that there's not braiding material there that should have been turned over? I can represent to the best of my ability that my understanding is there was not braiding material that should have been turned over. Thank you. There are no further questions. The government rests on her. Perfect timing. Thank you. And if you will mute your audio and video, we'll hear from Mr. Rivera. Thank you again, Your Honor. Your Honor, in this case, we are very concerned because we totally believe and we know how things do work here in the island. Once the newspaper, that's the major newspaper in the island, appeared the photographs of the appellant with the nickname El Diablo. And these two witnesses, the first witness who identified him in a nine-person lineup and the one who identified him after the newspaper article in the six-photograph lineup, they worked together. They knew each other. They have a close friendship. They work day to day, side by side. And we have to use, with all due respect, common sense in this case in the sense, Your Honor, that it is just too many suspicion points that if we put them all together in a bucket, maybe one of them might pass by. But if we put all these factors together, combined with the fact that, as the court just stated, there's no ballistics, there's no fingerprints, even though one of the suspects placed his hand on the desk, on the counter. There's no gunpowder residue test. There's no fiber residue with the clothing, even though he was arrested in the same hoodie that allegedly he used to do the robbery. There's no DNA blood testing with the spotter. There's physically no evidence at all. And we are very concerned that not only we don't have any connection, the defendant was arrested, as the record reveals on the docket entry, that he was arrested on April the 6th. And he had a counsel. And all this damage that was conducted during the investigation was caused because the defense counsel was not notified. He should have been made part of this process immediately when the defendant was arrested. This is the core of the critical stage. This is the core.  Once the government starts, and there's a criminal complaint, once the government starts the process, we have to respect the Sixth Amendment. This is a horrendous offense. It breaks my heart. But we have the Constitution for a reason. This is not something that we can just disregard. The Constitution, our forefathers were so wise that we have the Constitution to follow and to have a great society. Thank you, Your Honor. Thank you, Mr. Rivera. Have a great day, Your Honor. That concludes the argument in this case. Attorney Rivera and Attorney Tremble, you should disconnect from the hearing at this time.